**In re VAN SWERINGEN CORPORATION et al.**

**A. B. GOCHENOUR et al. v. J. P. MORGAN & CO.**

No. 8218.

Circuit Court of Appeals, Sixth Circuit.

Feb. 16, 1940.

As Amended on Denial of Rehearing May 15, 1940.

Joseph L. Stern, of Cleveland, Ohio (Joseph L. Stern, of Cleveland, Ohio, and Meyer Abrams and Harry J. Myerson, both of Chicago, Ill., on the brief), for appellants.

Benjamin F. Fiery, of Cleveland, Ohio (Baker, Hostetler & Patterson and Benj. F. Fiery, all of Cleveland, Ohio, on the brief), for appellee.

Before HICKS, SIMONS, and ARANT, Circuit Judges.

HICKS, Circuit Judge.

Cleveland Terminals Building Company (herein called C. T. B.) is subsidiary-debtor in the reorganization proceedings (Sec. 77B, of the Bankr.Act, 11 U.S.C.A. § 207) of Van Sweringen Corporation by which C. T. B. is owned. On November 12, 1936, appellee, J. P. Morgan & Company (herein called claimant) filed proof of claim in those proceedings against C. T. B. in the sum of $27,777,718.27, the unpaid balance and interest on a note of C. T. B. for $23,500,000 dated October 31, 1930, payable to bearer, and running 4½ years at 6%.

On October 27, 1937, appellants, including Gochenour and twenty-five others (herein called the objectors) as creditors of C. T. B. by virtue of their ownership of certain of its "first mortgage leasehold sinking fund 6% gold bonds," filed objections to the allowance of this claim.

A master dismissed the objections and recommended the allowance of the claim in full as an unsecured claim against the estate of C. T. B. The objectors excepted.

"Due to exceptional circumstances resulting from the passing of Judge West," the court did not grant an oral hearing, nor did it, on its review, read "the voluminous transcript of testimony," because it thought that there was no substantial dispute as to the facts. The matter was submitted on briefs and, giving consideration to the master's findings, the court overruled the exceptions and confirmed his report.

The appeal raises three main questions: (1) Whether the court erred in confirming the report without reading the record, inasmuch as certain exceptions challenged certain findings of fact; (2) whether the $23,500,000 loan transaction was void, it being contended that through collusion, participated in by claimant, C. T. B. did not receive the proceeds of the loan but that the same were used for the benefit of others, including claimant; and (3) whether, assuming the validity of the loan, the public auction of its collateral was valid, it being contended that the price received therefor was inadequate and that there was a secret agreement by claimant to prevent competitive bidding.

After the appeal was allowed by the district court, and after the record was printed and filed here, claimant filed a motion to dismiss the appeal upon the ground that appellants had not been granted the right to intervene under Sec. 77B, sub. c, of the Bankruptcy Act and upon the further ground that an appeal under the Chandler Act was ineffective because the district

court had entered no order making the Chandler Act applicable. The order appealed from was entered on December 12, 1938, and the Chandler Act became effective on September 22, 1938. We think that the allowance of appeal was within itself a reasonable exercise of the Judge's discretion under Chapter X, Article XVI, Sec. 276, sub. c(1) (2), of the Chandler Act, 11 U.S.C.A. § 676, sub. c(1,2), and the motion to dismiss is therefore denied.

C. T. B. was intimately connected by management and ownership with Van Sweringen Corporation, Vaness Company and Alleghany Corporation. By its management, it was also related to the subsequently organized Midamerica Corporation. O. P. and M. J. Van Sweringen and C. L. Bradley were together members of the boards of directors of the first four corporations named, between 1930 and 1935, and one or the other of these three men was president of each of the four during this period. The same three were on the board of Midamerica after it was organized. C. T. B., Van Sweringen Corporation and Vaness had but five directors, so that the Van Sweringens and Bradley constituted a majority. Alleghany had seven.

The Van Sweringen brothers owned 80% of the stock of Vaness, which in turn owned all of the stock of the Van Sweringen Corporation. The latter, as we have indicated, owned all the stock of C. T. B. These three corporations appear to have held the controlling ownership of Alleghany Corporation during the same time. Such is the background of the web of transactions which gave rise to the objections.

This common ownership and control of these several corporations with their ramified holdings and activity complicated the proof of the charge of fraud, and the master permitted considerable latitude in the admission of evidence relative to a conspiracy. Each of the business moves of C. T. B. in the period involved dovetail with that of at least one other corporation under the Van Sweringen influence. In turn they were made to dovetail with transactions with bankers, stockbrokers, etc. Whether claimant was guilty of fraud and collusion is a question of fact to be drawn by inferences from the evidence of these involved business transactions.

The negotiations culminating in the execution of the note involved were carried on by claimant on the one side and the Van Sweringens individually and Vaness on the other; and were embodied in a printed "Letter Contract" between Vaness and claimant dated October 30, 1930, and containing twenty-eight pages, including exhibits. As a part of the same transaction, Vaness obtained for itself a separate loan of $16,000,000 from claimant on its own secured note, which, however, was not endorsed by C. T. B. The letter contract stated that C. T. B. "desires to procure the sum of $23,500,000 for the purpose of repaying its present indebtedness to Paine, Webber & Company in the sum of $16,000,000 secured by the pledge of certain collateral, to repay the Van Sweringen Corporation the sum of $2,500,000 recently advanced to it by the Van Sweringen Corporation, and to provide $5,000,000 to be applied to the acquisition from the Van Sweringen Corporation of 500,000 shares of the common stock of the Alleghany Corporation, * * *"; and Vaness engaged "to cause" such action to be taken.

Under the letter contract there was not a direct borrowing from claimant. C. T. B. was to borrow the $23,500,000 from Vaness. At the meeting of the board of C. T. B. held October 29, 1930, C. T. B. was authorized to borrow the amount from Vaness by the execution of the note and to secure the note by posting the securities listed in Schedule "A" attached thereto. These securities were those to be acquired from Paine, Webber & Company. This resolution also authorized the purchase of 500,000 shares of Alleghany Corporation common stock from Van Sweringen Corporation for $5,000,000. No corporate action was taken by C. T. B. authorizing the purchase of securities from Paine, Webber & Company, or the "repayment" of $2,500,000 in cash to Van Sweringen Corporation.

Vaness did not actually advance any money to C. T. B. on the note. It had none to advance. It was itself then borrowing a hugh amount from claimant. The note was issued to Vaness as an expedient for obtaining its guaranty. Bradley, President of C. T. B., testified: "The note took the form * * * because they" (meaning claimant) "wanted a guarantee of the Vaness." The Van Sweringens guaranteed the note as individuals at the same time. No cash went to Vaness but a credit was set up in its favor on claimant's books and by letter dated October 31, 1930, addressed to claimant, Vaness instructed that it be charged with the amount of the note and

that the account of C. T. B. be credited therewith.

By letter dated October 29, 1930, C. T. B. directed claimant to pay $15,940,331 02 to Paine, Webber & Company in exchange for certain shares of stock, including 11,500 Alleghany Preferred and 1,122,950 Alleghany Common, and to charge its account for the amount; similarly, it directed the payment of $5,000,000 to Van Sweringen Corporation for 500,000 shares of Alleghany Common and their hypothecation with claimant as security for its note; and finally, on October 31, 1930, it directed claimant to charge its account with $2,-500,000 and credit the amount to Van Sweringen Corporation. There is no dispute over the balance of $59,000 left in the account after these disbursements.

At the time claimant purchased the note of C. T. B. it arranged for participation therein with six other New York bankers. Claimant and Guaranty Trust Company participated equally, to the amount of $6,-500,000 in round numbers, and claimant's participation in the two loans, that is, to C. T. B. and to Vaness, aggregated $11,-000,000.

On the surface, C. T. B. simply utilized the credit to make certain stock purchases and to repay a loan. However, objectors insisted that the transactions involved other Van Sweringen interests which were financially unsound and that the Morgan loan was an endeavor to use the credit of C. T. B. to aid them. Claimant knew that this was true.

George Whitney, a partner in claimant, testified: "Our purpose in making the loan was that we believed the loan in the first instance was a good loan and could be liquidated when we made it. We had been advised there were certain loans of various corporations of which the Van Sweringens were the chief officers, that were in a rather precarious situation, for one reason or another, and we believed that it was good business, wise business, to consolidate those loans for a sufficient period of time to give the chance for them to be liquidated in an orderly way. * * *"

Lamont, another partner, testified: "The two corporations" (that is, C. T. B. and Vaness) "had certain obligations outstanding which the Van Sweringens were anxious to have protected, undoubtedly, and they came to make some bank loans in order to try to protect them."

That the transactions were all related to each other, to achieve several ends, was not an accident. John P. Murphy, counsel for a number of the Van Sweringen corporations, testified: " * * * there were different transactions with different companies, all timed to occur simultaneously."

Objectors contended that one of the purposes of the loan was to provide money to the Van Sweringen Corporation to pay the November 1 interest of $900,000 due on its $30,000,000 note issue of May 1, 1930, which had been underwritten by Guaranty Trust Company and for which Guaranty Trust Company was trustee. J. J. Anzalone, Treasurer of C. T. B. and Assistant Treasurer of Van Sweringen Corporation, testified that on October 20 Van Sweringen Corporation had but $298,-381.73 in cash with which to meet the interest. However, it received on October 31 two and one-half million dollars from C. T. B. as a part of the proceeds of the loan from claimant. On direct examination he testified: "I have no personal knowledge as to why they" (these funds) "were turned over to the Van Sweringen Corporation." Later, on cross-examination, and after having been prompted by counsel, he testified: "There had previously been advanced to Cleveland Terminals Building Company by Van Sweringen Corporation sums from time to time, and The Cleveland Terminals Building Company was indebted to Van Sweringen Corporation in excess of that amount and this amount was repayment on that account and charged to that account." In view of his previous disclaimer of knowledge and of the fact that this answer was in response to the cross-question, "The two million and a half disbursements from Cleveland Terminals Building Company to Van Sweringen Corporation represented a loan or a repayment of a debt or what was it made for?" there is a suspicion the answer had been suggested to him. However, under the circumstances of the questioning much depended upon the demeanor of the witness in answering. The master seemed satisfied with the answer elicited on cross-examination, and also with the answer of John P. Murphy to the same effect after counsel for claimant had restated Anzalone's testimony in his presence, and after Murphy had just testified: "I have no recollection of two and one-half million dollars being paid to Van Sweringen Corporation for any purpose." These may be instances of re-

vived memory. The master's observation must be given weight and we are not moved to upset his finding on this point. Ohio Valley Bank Co. v. Mack, 6 Cir., 163 F. 155, 24 L.R.A.,N.S., 184. That there had previously been such loans from Van Sweringen Corporation is somewhat buttressed by the fact that subsequently between November 1, 1930, and February 19, 1931, Van Sweringen issued checks to C. T. B. in the amount of $1,662,000.00 without apparent consideration; and by the Financial Statement of Van Sweringen Corporation and C. T. B. issued on December 31, 1930, disclosing that some twenty-six million dollars had been advanced to C. T. B. by Van Sweringen Corporation on open account.

A second aspect of the thirty million dollar Van Sweringen Corporation note issue is involved. Reference to the agreement with the Guaranty Trust Company and to the trust indenture discloses that Van Sweringen Corporation agreed to hold as "segregated assets" 500,000 shares of Alleghany Common valued at $30 per share, or 50% of the value of the issued notes and to continue to hold "segregated assets" to the value of 50% of the notes outstanding. Any deficiencies, due to decline in the value of the segregated stocks or to other causes would be repaired by the Van Sweringens as individuals, by delivery to the Van Sweringen Corporation of readily marketable securities equal to the deficiencies. All obligations of the brothers under the Agreement were to terminate as soon as fifteen million dollars of the notes had been retired. The "segregated assets" were not "deemed to be a mortgage, pledge or other incumbrance." The corporation simply agreed to acquire free of any lien or incumbrance 500,000 shares of Alleghany Common to be held as such or cashed to retire the notes or to purchase United States Government obligations.

The trust indenture, it will be recalled, was dated May 1, 1930. Before the first interest payment became due on November 1 of that year, Alleghany Common had declined so rapidly that the 500,000 shares had to be supplemented with a segregation of 400,000 additional shares of Alleghany Common to maintain the proper level of "segregated assets."

C. T. B. came into this picture by apportioning five million dollars of its loan from claimant to the purchase from the Van Sweringen Corporation of 500,000 shares of the Alleghany Common, the money being used by Van Sweringen to buy Government securities "which had no fluctuation market."

This purchase by C. T. B. was authorized by resolution of its board, the resolution and terms of the sale giving Van Sweringen Corporation the option to repurchase the 500,000 shares at any time on or before May, 1935, for the aggregate sum of five million dollars, subject to the right of C. T. B. to pledge the shares as security. Anzalone could not justify giving this option to repurchase at the same price, especially in view of the fact that C. T. B. would have paid approximately one and one-half million dollars in interest on the money during that period; nor could Bradley, President of C. T. B., who first said it was a good investment; then said it was to put the operation of Alleghany into one company; and finally testified that it would make no difference since C. T. B. was a wholly owned subsidiary. These 500,000 shares which C. T. B. bought were already in the hands of claimant for "safekeeping" for the Van Sweringen Corporation account, and in its letter of direction to claimant to pay the $5,000,000 to Van Sweringen Corporation, C. T. B. directed claimant to hypothecate these shares to the $23,500,000 note.

The market price per share of these 500,000 shares on October 31, 1930, was but $12, having declined from a value of $30 on May 1, 1930, when these shares were first "segregated" to secure the Van Sweringen Corporation note issue.

This purchase by C. T. B. of the 500,000 shares of Alleghany Common has its questionable aspects. Objectors say that the entire loan was an attempt to seize the credit of C. T. B. for the benefit of the other corporations. C. T. B. was the oldest of the Van Sweringen corporations and had large holdings of real estate, leaseholds, etc., with substantial income. Vaness was organized in 1922, Alleghany Corporation in 1929, and the Van Sweringen Corporation in April of 1930. Claimant had bought $25,000,000 of the preferred stock of Alleghany Corporation prior to October, 1930. Whether it still owned this stock in October does not appear, but through its holding of Alleghany Common in the "segregated assets" it must have known of the decline in its value. It must have had some knowledge of the Van Sweringen Corporation's thirty million dollar note issue, because

Whitney and Lamont were on the board of Guaranty Trust Company and claimant held the "segregated assets" therefor. In fact, Whitney testified that they "had been advised" of the "precarious situation" of certain loans of "various corporations of which the Van Sweringens were the chief officers." It is clear enough that the loan was made by claimant with full knowledge of the circumstances and that its disposition by C. T. B. was for the purpose of putting a floor under the rapidly depreciating Alleghany Common and to sustain the value of the Van Sweringen Corporation note issue by meeting the interest thereon.

Objectors say that there was a conspiracy to use the credit of C. T. B. for these purposes and that it was a fraud to do so. The evidence convinces us that it was the common purpose of claimant and the other corporations involved in the loan to support Alleghany and Van Sweringen. Whether it was a fraud is another question.

The master reported that on October 30, 1930, the market value of the 500,000 shares of Alleghany Common was six million dollars. Objectors say that they were not worth that much. There is no direct evidence that they were not, although there is a strong inference that they were not, from the rapidity with which they had decreased in value and from evidence that their value was sustained by trading among the Van Sweringen companies.

■ Under the circumstances we do not regard ourselves strictly bound by the concurrent finding of the master and District Judge as to the market value of these shares on October 30, 1930. In re Lang Body Co., 6 Cir., 92 F. 2d 338; Elbro Knitting Mills v. Schwartz, 6 Cir., 30 F.2d 10.

But, aside from inferences as to the value of the stock when purchased, and as to claimant's confidence in the Van Sweringen enterprises, the money was advanced at least partially upon the credit of C. T. B. which we regard as but an instrumentality of Van Sweringen Corporation, by which it was owned directly, and of Vaness, by which it was owned indirectly. Claimant knew this and we think it should share responsibility for a loan based upon the credit of a corporation which had no independent voice in its management, but which had separate and independent creditors who might be adversely affected thereby. C. T. B. bought the stock for five million dollars with option in Van Sweringen Corporation to repurchase it for the same amount on or before May 1, 1935. Assuming that it was worth six million dollars, it was beyond C. T. B.'s power to benefit thereby, and in addition, it was obligated to pay interest up to $1,350,000 on the money it had borrowed to make the purchase. If the option were exercised it was "out" the interest. Van Sweringen Corporation might not exercise its option, but this contingency was beyond C. T. B.'s control. We think the evidence justifies, if it does not compel, the conclusion that claimant knew all this and that its own interest in the transaction was such as to tinge it with fraud toward C. T. B.'s creditors.

■ Our holding and decree is that that portion of the claim based upon this five million dollars should be and is held as secondary to the rights of the bona fide creditors of C. T. B.

The third major disbursement made by C. T. B. out of the proceeds of the loan was that to Paine, Webber & Company in satisfaction of a debt to it in the amount of $15,940,331.02. Objectors introduced evidence tending to show that in June of 1930 C. T. B. made large purchases of stock from Paine, Webber & Company which were in reality made from Vaness through the agency of Paine, Webber & Company, the inference being that the securities paid for out of the proceeds of the loan actually passed through Paine, Webber & Company simply as a blind to conceal Vaness, the real seller. The purchases, as we have said, included 1,222,950 shares of Alleghany Common and 11,500 shares of Alleghany Preferred, in which latter claimant had previously made large purchases. All of the stock received from Paine, Webber & Company was deposited with claimant as collateral for the loan as soon as it was purchased. Whitney testified that he knew on October 31, 1930, that the various companies of the Van Sweringen interests owned large blocks of Alleghany Common stock. He had "no knowledge of when they were purchased." The preliminary discussions which led to the two loans were held at a meeting in Lamont's home, but neither Whitney nor Lamont could remember in detail who was there or the nature of the discussion. Whitney said it was simply preliminary to investigations leading to the loans. He testified that he first heard in March of 1937 or December of 1936 at the Senate investigations conducted by Senator Wheeler that

"the Van Sweringens either personally or using the name of The Cleveland Terminals Building Company or Van Sweringen Corporation or Vaness Company * * * were purchasing Alleghany stock in large blocks." But Whitney testified that at the time of the loan it was "his understanding that the C. T. B. owed them" (Paine, Webber & Company) " a certain sum of money secured by market collateral, and with the proceeds of the loan to the C. T. B. that loan from Paine, Webber & Company was paid off and the collateral released * * * to the C. T. B. who again pledged it to us."

■ We conclude that the concurrent finding of the master and the District Judge that the payment to Paine, Webber & Company was in discharge of the obligation of C. T. B. is not refuted by any inference of fraud to the contrary.

■ Objectors say that C. T. B. was originally organized to construct buildings and to own and manage real estate; that in May or June of 1930 it was reorganized to deal in stocks, bonds, etc., "to aid in any manner any corporation * * * in the welfare of which this corporation shall have any interest direct or indirect." These purposes are of course diverse from those of the original charter, but, without going into the question whether such a change of purpose was valid, we think the objection comes with ill grace, more than seven years after the reorganization, and that the objectors may not raise the point here, even if it had any bearing on the question of fraud.

On May 1, 1935, C. T. B. defaulted on its note and on that day, it, Vaness and the Van Sweringen brothers wrote a joint letter to claimant, stating that neither the makers nor the guarantors were able to pay "other than by resort * * * to the sale of the collateral securities pledged to secure the payment of and interest upon said notes and agreement."

Upon being thus notified, claimant consulted with the various New York participants in the loan relative to the sale of the collateral, and was authorized "to offer the collateral securities * * * for sale at public auction." A letter setting forth the procedure was sent to the Midland Bank at Cleveland, a participant in the Vaness loan, which stated that the securities for both loans were to be offered at the same time. The collateral securing the Vaness note was divided into groups 1 and 2 and that securing the C. T. B. note into groups 3 and 4. Groups 2 and 4 consisted, for the most part, of securities listed on the New York Stock Exchange of companies not controlled by the Van Sweringens. Groups 1 and 3 consisted largely of stock of the Cleveland Railway Company, stock of Alleghany Corporation and stocks and obligations of other Van Sweringen companies located and doing business in Cleveland. As to these, the letter stated: "A great deal of this collateral has become substantially worthless and would require large additional advances if any value is ever to be realized." It also stated: "We have been advised informally by Messrs. O. P. and M. J. Van Sweringen that they have interested outside capital with which they will be associated, to bid for the collateral in groups 1 and 3. They have not indicated any intention of bidding for the collateral in groups 2 and 4."

The letter further stated that claimant had been authorized to "bid for the securities in groups 2 and 4 an amount equal to the quoted market prices at the time of the sale." An intention, stated in the letter, to make a bulk bid of approximately $2,-700,000 for the securities in group 1 and of $300,000 for those in group 3 was changed by a "private and confidential" letter to Midland three days before the sale, which had been advertised for September 30, the letter stating that participants had decided not to bid in bulk for groups 1 and 3 but had authorized claimant to bid separately for items in 1 and 3 according to an attached schedule. The totals of these several authorized bids for each of the four groups were: For (1) $2,798,814.55; for (2) $309,750; for (3) $305,645.99; and for (4) $1,271,890. The letter concluded: "Will you please confirm to us your approval of the above outlined procedure?"

Objectors assert there was a secret agreement between Van Sweringens and claimant, by which claimant engaged not to bid on groups 1 and 3 and the Van Sweringens not to bid on groups 2 and 4.

Objectors rely upon their exhibit 5, a letter of doubtful competency, since it was never sent. It was dated May 26, 1935, and was assertedly sent by claimant to the President of Guaranty Trust Company. If it were sent there is nothing in it to indicate an agreement not to bid. The letter simply stated that the Van Sweringens were interesting outside capital which

would bid at least $2,700,000 on group 1 and at least $345,000 on group 3 but that "they have not indicated any intention of bidding for the collateral in groups 2 and 4."

There was evidence of discussion amongst the participating banks as to what they could afford to bid. They fixed minimum bids on groups 1 and 3; but in view of the experiences they had had with the Van Sweringen securities we see nothing reprehensible in fixing a maximum as to what they thought they were worth. There was no evidence of an agreement between claimant and Van Sweringens as to purchase.

Tomlinson, who was instrumental in forming the Midamerica Corporation, which bid in groups 1 and 3, was a director of the Midland Bank. He was first approached by the Van Sweringens. But he had never been a director of C. T. B. or of any of the Van Sweringen corporations except the distantly related Missouri Pacific. He and Mr. Ball furnished the money for Midamerica and the Van Sweringens had no financial interest in Midamerica at all. He testified: "I made the investment * * * for the purpose of keeping the property in Cleveland, to help a friend or friends out, the Van Sweringen brothers. I sold it shortly after Mr. M. J. died to Mr. Ball. I realized no profit out of it directly or indirectly, I thought my job was done. * *"

There is no evidence of any agreement not to bid.

The sale was held at public auction on September 30, 1935. Midamerica purchased the securities in groups 1 and 3, paying a total of $2,803,000 for those in group 1 and a total of $318,000 for those in 3. Hallgarten & Company bid $1,275,000 for group 4. All bids were slightly in excess of the amounts authorized by participants. After deduction of expenses and taxes on the proceeds of the sale, and the allocation of cash of C. T. B. on special deposit, claimant made a credit of $2,446,593.55 on October 1 to C. T. B.'s account.

Exhibit 14 discloses that the "market value" as of September 30, 1935, of the securities purchased by Midamerica was $5,745,219.63. This was admitted by claimant in its brief. Objectors attempted to introduce a document purporting to show how Midamerica allocated the purchase money in each group to the securities bought, and disclosing that it placed a higher valuation upon Alleghany Common purchased in group 1 than upon that purchased in group 3. The master properly rejected this document. The bids were bulk bids and Midamerica's later breakdown of the cost could have no bearing in fixing the real value of the securities on the date of the sale.

We think that the action of the participants themselves is the strongest indication of value. The claim against C. T. B. alone for unpaid principal is over nineteen million dollars; for interest and principal it was over twenty-seven million. Participants were faced with such huge losses on both loans it is unthinkable that they would have abandoned any conceivable value in the securities they had held for the uncertain benefits of an unsecured claim against a bankrupt estate.

The decree is modified as hereinbefore indicated, and as modified is affirmed and the case is remanded.